Good morning, Your Honors. My name is Peter Johnson, and I represent the appellant, Mr. Toledo-Reyes. I have ten minutes for my argument. I'd like to reserve three minutes for rebuttal. I would like to, as the Court knows, this case is focused on a sentencing enhancement, two sentencing enhancements that were applied to a conviction under 8 U.S.C. 1327 for illegally bringing individuals into the country. I would like to focus my argument on the facts of even if the statements by the witness participants were reliable, the facts of this case do not allow for the application of these two enhancements. First, the government agrees that none of the witnesses identified Mr. Toledo-Reyes as the pilot or captain of that boat. The second is that the government agrees that all of the reported injuries were caused by the rough surf. The application under 2L1.1b6 requires the intentional or reckless creating of substantial risk or death or serious bodily injury to another person. Under the facts of this case, there was no creation by Mr. Toledo-Reyes of a substantial risk, and there was no creation of serious bodily injury. Now, is the argument twofold that because he wasn't actually the captain of the boat, that he didn't do it and therefore whatever happened can't be charged to him, and that second, whatever happened wasn't that dangerous? Yes, Your Honor. Under the courts, that's a case cited on page 18 and 19, torus floris, the court focused on the defendant's conduct and then also the court in applying these two enhancements, also the court in Horea Rojas focused on the defendant's conduct. Now, but if he's the smuggler, that is to say if he's the one kind of in charge of this venture at this stage, and he's employed the man driving the boat, why isn't he responsible for the way the boat is being driven, the decision to land it in the surf instead of at a normal dock and so on? Your Honor, there's no evidence to the record I believe that the government can see that he's not the actual person that employed this individual. There's no evidence of that. But there's evidence that he's in charge of this group of people being smuggled. Yes. You're right. So to the extent that there is a smuggler who's in charge of this stage of the operation, the evidence is that it's your client. Yes, Your Honor. But I think what the court has to do is focus on the dangerous condition, and I think this appeal as noted is focused on the two, the application of these two enhancements, not that he wasn't involved, but the application of these two enhancements. And that's when it's conceded that it's not the defendant's conduct that's the pilot or captain of the boat, then the court has to look at under, I guess, relevant conduct, is whether this was reasonably foreseeable conduct. Is there inherent risk in traveling on a Punga boat on the open seas at night with a boat that was not regulated and did not provide for sufficient number of vests and travel at high speeds? I'm now reading from the finding made by the district judge when he imposed the enhancement for risk of death or serious bodily injury. Why aren't those factual findings sufficient? Your Honor, it's the appellant's position that no, it's not unreasonably dangerous. If the boat was traveling from point to point in California, and Punga boats do, in fact, do that, there's nothing unreasonably dangerous about a boat, a Punga boat. Punga boats are traditionally used inside of California. There's nothing unusually dangerous about traveling at night or in the daytime, that these are facts that are commonly associated with a travel in a boat. The lower court also found that there was, I guess, insufficient life vest. One of the arguments is that the statements made are unreliable as it relates to the individuals that were witness participants, but the more important argument is that the life vest had nothing to do, the absence of this life vest, if in fact it did occur, had nothing to do with the alleged injuries. It's undisputed that this was a safe arrival, that they actually got to the shore, that this was caused by a wave that hit the boat when it was on shore, that the life vest didn't cause any of these injuries. The life vest wasn't relevant at the time, even if the life vest didn't exist. So as the court's question, at night and daytime there is no difference. Well, you know, I think there's a big difference of traveling at night in a boat with one life preserver short and coming into shore through surf. Among other things, before you get to the surf, if you're simply traveling on the ocean, if there are no lights on the boat, and I don't know whether we've got any record on that one, but I rather suspect there weren't any lights on the boat, that's dangerous in itself because other boats traveling might not see you. If it's rough seas, as I gather that was the testimony, anyone knowing about boats knows that you want to be able to see the waves coming at you so that you can direct the boat, control the speed in relation to the waves. Anyone knowing boats knows that if someone goes overboard at night, you are in big trouble because you can't find them. I think the fact that this was at night does increase the danger from the fact that it was during the day, and anyone making a decision to land a small boat through heavy surf off the coast of California is undertaking a dangerous exercise, and that's particularly so at night. If somebody goes overboard, the boat flips, and you're at night, you are in big trouble compared to if this happened during the daytime where everybody can see what's going on. You know the roughest part of the Pacific is between all those islands that are off the channel and the shoreline. Have you ever been out on a boat? I have been out on a boat, but I haven't been in the area I guess that's alleged. If I can respond, this boat actually left. It's undisputed that the boat left, so if it capsized, it was fine to leave. There's no evidence that there were no lights. I'm not sure that they... I'm making that part up, and it's unessential to what I'm thinking about. But there's no question in my mind that it's more dangerous to travel on a boat at night than in the daytime. But one of the things that I think the court has to look at is the substantial risk and whether that actually is applied in this case. And there's nothing that outlaws or regulates the travel of a boat like this at night, and there's nothing that makes it more illegal that the boat is traveling at night. And again, there's no evidence in the record that there were any lights on the boat or the boat was old or new or what have you. What we do know is that the boat flips when it comes in in the surf, correct? Well, our argument is twofold. One is that the reliability of the two statements that we're disputing, one is the reliability as to whether the statement that there were enough life jackets. The second is that it capsized. But assuming those facts, that the boat, whether a few individuals were getting off and it tipped over, the boat, I guess, did turn over. Even if that's the case, there's no evidence in the record that Mr. Toledo Reyes was piloting or was the captain of the boat. And again, whether Mr. Toledo Reyes, it was reasonably foreseeable that the rough surf would have caused this and Mr. Toledo Reyes would have known that. I think what the application notes in the guidelines show that the... Well, when the boat turned over, what was the direction of the bow? I don't know. This boat actually left. There were no statements in the record that say what the court is asking. So I don't know the answer to that. But I do know that based upon the facts in the record and the statements, that this was on the beach or approaching the beach, that it was very close, that people didn't scratch themselves on rocks if it wasn't close to the beach, that it was, in fact, they had arrived and they were, I guess, disembarking the boat when this occurred. So under those circumstances, I think that's the way I'm evaluating this case. Well, you know, it might be that the wave came in and broadsided the boat and so that the hull was parallel to the shore. Your Honor, I see I'm out of time, but I actually don't have an answer to that question. I wasn't there. I don't know. All right. Thank you. May it please the Court. Robin Bacon on behalf of the United States. There are two issues that defense counsel has raised both in his papers and here this morning, and there are really two questions that must be resolved in this matter. And the first is whether the statements of the material witnesses had the minimal indicia of reliability necessary for the court to reasonably rely on them in determining defendant's sentence. And a review of the record in this case demonstrates they certainly did have minimal indicia of reliability. In fact, they had more than minimal indicia. As pointed out in the government's papers, the statements corroborated each other. The material witnesses gave very consistent reports of the manner in which they came to the United States, which is to say traveling in a Ponga boat after making arrangements in Mexico, and that the boat traveled overnight. It traveled at night. The government did address that issue, but it didn't address the sufficiency of the record to support the enhancements. It would have been helpful to have seen the government's position on those two enhancements in advance of argument. Yes, Your Honor. The government's position is that the statements, especially when combined with the observations of the agents, as the district court pointed out in its factual findings, was sufficient to demonstrate by either a preponderance of the evidence or even by clear and convincing evidence that, in fact, the two enhancements should apply. Defendant's primary argument for why they shouldn't apply is not even based on the facts in the record. It's actually a question of whether or not the circumstances of the trip count as relevant conduct for defendant's sentence. And a look at the guidelines themselves demonstrates that, in fact, this falls squarely within the realm of relevant conduct. The ---- Do we know how big this boat was? We don't know the ---- Let's look at whether the circumstances are such that there's an inherent risk beyond just traveling in a Ponca boat, if there's overcrowding, if there's lack of life vests, for example, factors that would make it inherently riskier than what it would otherwise be. Because this is, I take it, a fairly normal mode of travel, the use of these boats? Well, when you say fairly normal mode of travel, Your Honor ---- But it's utilized for fishing and other recreational activities. They are used for fishing and recreational activities. And to provide a bit of perspective, we don't know the exact dimensions of this boat because the boat was not present at the time. But Ponca boats are boats that are designed for recreation and fishing. This was a journey that took them from Ensenada, Mexico, to Malibu, California, which is a considerable distance through international waters and open seas. And this would be equivalent to taking an outboard motor on a trip through the open ocean waters. These boats are not designed to hold large numbers of people. These are boats that are intended for smaller groups of people to take for shorter journeys than the one described here. This boat had 10 people on it. Based on the descriptions of the boat provided by the individuals, it certainly was not a luxurious trip. There's no shelter on these boats. They are open boats. In this case, witnesses did describe that they didn't have sufficient life vests, which is of particular importance. When you're talking about an open boat in the ocean, in the event of any accident, there's literally nothing to keep people from falling directly into the water. So the government's position is not that anybody doing anything in a Ponca boat is taking unreasonable risks. But this was not a fishing trip. This was not a leisure cruise. This was an alien smuggling venture, which means that it was conducted by necessity as part of the scheme in order to avoid detection, which means although there's no avoiding contact with other vessels, in order to travel overnight from Ensenada, Mexico to Malibu, you do have to travel at considerable speed. That is a larger distance than would normally be undertaken in a craft of this nature. And so it's the specific circumstances of this kind of trip that create the unreasonable and substantial risk of danger. It's also worth noting that the boat didn't land at a pier and it didn't land at a dock. It landed at a beach, a rocky beach, at 4.30 in the morning. And upon arrival on the shore, setting aside even the issue of the capsizing, the people on the boat would have had to get off a boat at night on a rocky beach and climb up a cliff to waiting transport, which is in fact where they were found. These are all part of the circumstances that the Court should and did take into consideration in deciding whether or not the trip itself, there was a substantial risk of injury caused by the circumstances of the trip. And it's also the basis for saying that defendant, as somebody who voluntarily undertook to participate in this scheme, should have a sentence to his sentencing guidelines should take into account the circumstances under which the scheme was executed and the fact that three people were injured. Kennedy. Now, the government recommended a sentence slightly lower than imposed by the district judge. How come? Your Honor, as set as I put in my position papers, there were definitely mitigating factors here that had bearing on the sentence under 3553A. And that is the appropriate place in the government's position to take into account things such as the fact that defendant himself was not captaining the ship, that defendant himself was also faced with some danger in making the trip under these conditions. So the government's position is that that is not a suitable place for a guidelines calculation, that the guidelines should be based on his relevant conduct. But in determining a reasonable sentence, it's certainly something that the Court should take into consideration. And I gather the judge sentenced to, what, three months more than the government recommended, is that right? Yes, Your Honor. The judge's sentence was three months more than the government's recommendation and 10 months lower than the low end of the guideline calculation. And he did state reasons on the record for the departure, which included taking into account defendant's role in the offense. A guide in an alien smuggling operation certainly plays a very important part. Someone has to be responsible for bringing the individuals from the boat to the shore and connecting them with transportation. And the way these operations work, and this is set forth in the record in the complaint, no one is paid, basically, until the aliens arrive at their destination So it's not to minimize defendant's role in the operation as a whole, but it is to recognize that as somebody who is not directly responsible for the boat, that his sentence should certainly take that into consideration. Okay. If there are no further questions, the government will submit on its papers. Your Honor, if I could just have just a few quick points. One is that there is no evidence of the size of the boat. Angle boats can be 10 to 50 feet. There is no evidence as to the overcrowding in this boat. In fact, there were only about 10 individuals that arrived on the boat and three individuals, two to three individuals that left. Under the guidelines of the application, though, these are the types of things that would cause an unreasonably dangerous situation. This court in 2007 decided the Torres Flores case, and in that case, there was a modification of a pickup truck, a modification that the district court said because there's a modification, this enhancement should apply. This court looked at that and said, well, the danger has to be beyond that which exists in normal travel. It is the appellant's position that there's nothing out of the ordinary between the night and day travel and nothing out of the ordinary in this particular trip. And even if there is a dangerous situation related to the life vest, the absence of a life vest was reliable information. The court in Herrera Rojas said that B6 and B7, there has to be a causal connection between the two. In this case, there is no causal connection between the injuries that were sustained and the life vest because the life vest wasn't actually needed at the time of the shore and the absence of a life vest wasn't the cause of any of the injuries. Thank you, Your Honors. Thank you.
judges: Pregerson, Fletcher, Nguyen